Hillsborough,⎰
Dec., 1896. ⎱

STATE *v.* MOORE.

Under P. S., c. 207, s. 3, and the act in amendment thereto (Laws 1895, c. 56),
a trial term of the supreme court may be adjourned to another place in the
county for one or more days without publication of such adjournment, as
against parties having actual and seasonable notice thereof.

The statutory provision that the court shall direct the number of jurors to be
summoned, and from what towns, having been in force in this jurisdiction
since 1758, is not in conflict with the constitution.

INDICTMENT, for fraudulently making a false record of a certain certificate numbered 108 of the stock of the Union Publishing Company, which the respondent, as treasurer, issued to J. C. Moore, of Laconia, N. H., November 5, 1894, with an intent to defraud.

The respondent seasonably filed a motion for a change of venue, alleging that he could not have a fair and impartial trial in this county. The court reported as follows : " Upon considering all the evidence, the court does not find that there is probable ground to believe that the respondent cannot have a fair and impartial trial in this county, and the motion is denied. The evidence tended to show that there was prejudice against the respondent in the city of Manchester, although reputable witnesses testified that he could have a fair trial in Manchester from jurors drawn in part from its citizens. The court ordered that no jurors be drawn from Manchester and certain towns adjacent thereto, and was of the opinion that the public good would be promoted by having trial at Nashua, and the court adjourned thereto." To the order that the trial be had at Nashua the respondent excepted.

Before the jury was drawn for this case, and while the entire array was present in court at Manchester, the respondent made and filed the following motion : "And the said respondent comes and moves that the entire array of jurors now in attendance on said court, from whom it is proposed to select a panel to try the above entitled action, be discharged and dismissed on the ground and for the reason that said jurors have been irregularly and illegally selected and summoned to attend at this time; that said jurors have been selected from only twenty of the towns of said county and from a small section of the county, and not from the body of the county at large; and that no jurors are returned from the nine wards in the city of Manchester, and the nine wards in the city of Nashua, and from the towns of Bedford, New Boston, Merrimack, Sharon, Windsor, Litchfield, Hudson,

and Goffstown, so that each town and ward does not furnish its proportion of jurors as required by the statute. The said respondent objects and protests for the reasons aforesaid to the entire array of jurors now in attendance from which it is proposed to draw a panel to try said case; and also for the reason that all of said jurors are prejudiced against the said respondent and an impartial panel cannot be selected therefrom. He therefore moves that the case may be continued, and for a change of venue."

After issuing the *venires* as above described, and before the return day thereof, the court ordered the trial to be had at Nashua on May 28, against the objection of the respondent and subject to his exception; on that date, both at Manchester and at Nashua, after a jury had been impaneled, he renewed his objection to being ordered to a trial at Nashua. At this latter time and place he assigned as a reason for his protest that the provisions of the statute with regard to adjournments had not been complied with, and that the court had no jurisdiction at Nashua, citing P. S., c. 207, ss. 3, 4, 5, and Laws 1895, c. 56. No order for adjournments had been published as therein provided, but the court ordered the trial to proceed and the respondent excepted.

The state was allowed in its opening, subject to the defendant's exception, to refer to an over-issue of stock of said corporation by the defendant as treasurer, and also to introduce evidence as to said over-issue, for the purpose of showing that the defendant fraudulently made the false record set forth in the indictment.

The articles of association of the Union Publishing Company were dated July 27, 1880, were recorded with the secretary of state, November 5, 1880, and with the city clerk of the city of Manchester, November 8, 1880. Prior to the recording of the articles of association, the company adopted by-laws. Subject to the defendant's exception, the state was allowed to put in evidence the by-laws and to show by a subsequent witness that they had been recognized by amending them on several occasions after they had been recorded. The by-laws were put in evidence by John H. Riedell, the first clerk of the association; and subject to the defendant's exception, the state was allowed to show by him that it was his recollection that the by-laws were adopted after the articles of agreement had been signed.

Subject to the defendant's exception, the state was allowed to show by the record of the Union Publishing Company that Joseph W. Fellows was elected clerk thereof December 5, 1882, at a meeting adjourned from the annual meeting held November 21, 1882, and that he held this office down to the annual meeting of 1896. As to the admission of evidence of this election the defendant's counsel said : " To this record we object for two reasons. It appears affirmatively from an examination of the book itself

that no notice was given to the stockholders of this meeting, and it is apparently a record of a meeting held without any notice. Second, because, so far as appears, this meeting was held without any time or place having been fixed by the board of directors as provided for in the only suggestion of by-laws that has been presented." He further stated that "we do not assent in this case to the use of any alleged *de facto* organization."

Subject to the defendant's exceptions, the state was allowed to show from the records that at the annual meeting in 1885, held on the third Tuesday of November of that year, certain amendments to the by-laws were passed and the defendant was elected treasurer of the corporation; that at a meeting held February 9, 1894, adjourned from February 6, 1894, the by-laws were amended; and that the capital stock of said corporation was increased and limited to $150,000, represented by fifteen hundred shares.

Among other things, the court instructed the jury as follows: " If the state is to maintain its charge, if the respondent is to be adjudged guilty of this crime for which he is indicted, it must satisfy you :

" First. Of the organization and existence of this corporation.

" Second. It must satisfy you that the respondent was the treasurer of this corporation at the time said record was made.

" Third. It must appear that as such treasurer it was his duty to keep a record of the stock issued by the corporation.

" Fourth. That he fraudulently made a false record of said certificate No. 108 with intent to defraud.

" As bearing upon the organization and existence of this corporation, there has been introduced in evidence what is claimed to be the original agreement of organization of the Union Publishing Company, also what is claimed to be portions of the record from the secretary of state's office and from the city clerk's office in Manchester wherein these articles of agreement were recorded, and what is claimed to be portions of the records of this company. There has also been presented to you what is claimed to be a certificate of the secretary of state of an act of the legislature in regard to this company.

" The effect of this agreement and of these records and of these certified copies — if you find them to be the papers that they are claimed to be — is that this company was organized and is in existence, and was in existence at that time when the offence charged is alleged to have been committed ; that the respondent, Joseph C. Moore, was elected treasurer in 1890 and at the annual meeting, February 9, 1894, and continued in said office down to the time of his resignation, October 2, 1895 ; that the legislature authorized this company or empowered them to make their capital stock, if they desired, $200,000, and that by various votes of

this company its treasurer was, at the time when this offence was charged against him, authorized to issue $150,000 worth of stock,— fifteen hundred shares of a hundred dollars each. If you find this to be the original agreement of incorporation and these records to be what they are claimed to be, you will find that this company was duly organized and in existence, that this respondent was treasurer from as early as February 9, 1894, to the time of his resignation, October 2, 1895, and that he was authorized to issue stock of this company up to fifteen hundred shares and not exceeding that.

"Section 12 of chapter 149 of the Public Statutes, together with extracts from the records of this corporation, has been put in evidence on the question whether it was the duty of the defendant, as treasurer, to keep a record of the certificates of stock issued by the corporation. If you are satisfied of the existence of such records, and that they are what they are claimed to be, taking them in connection with said section of the Public Statutes, you will find that it was the duty of said defendant as treasurer to keep a record of the certificates of stock issued by the corporation. The question now remaining is : Did the defendant, as such treasurer and while he was treasurer, fraudulently make a false record of the issuance of certificate No. 108, with intent to defraud ?

"Upon this question the certificate book of the company has been put in evidence, and the stubs therein have been referred to as containing records of such certificates. If you are satisfied that the stubs or the stub part of this certificate book was intended as a record of the certificates of stock of said company, then you will consider the record as to the issuance of certificate No. 108. Was this record false or was it true ? Does the number of shares mentioned in the certificate agree with the number of shares mentioned on its corresponding stub ? If you find it does,— if you find it is a true, an honest record of this certificate issued,— then the defendant is not guilty. Or if you find that the record of the number of shares of said certificate, as it appears on the stub, does not correspond with the number in the certificate, but that the record was made accidentally, or with an honest purpose, or not with an intention to defraud, then the defendant is not guilty. Or if you find that the false record was made after he ceased to be treasurer, then no matter what may have been his intent he is not guilty of the offence with which he stands charged.

"But if, on the other hand, you find that the record was false, that is, that the number of shares mentioned in the stub of the certificate No. 108 was and is different from the number of shares mentioned in certificate No. 108 itself; in short, if you find, as claimed by the state, that the number of shares recorded

on stub No. 108 is only two, when it should have been ten (the number of shares mentioned in the certificate), then you will find the record to be a false one. Having found it false, you will then consider whether or not it was made in this county and made fraudulently, with an intent to defraud. If it was so made, and made, as before stated, while he was treasurer of said company, then your verdict should be that the defendant is guilty.

"If, then, you find that the Union Publishing Company on February 9, 1894, and prior to and subsequent to that date, was a corporation; that during said time down to October 2, 1895, Joseph C. Moore was the treasurer thereof; that it was his duty as such treasurer to keep a record of the certificates of stock issued by said corporation; that he made a false record of the certificate of said corporation, numbered 108, in this county, while he was treasurer as aforesaid; that he made this false record fraudulently, that is, with intent to defraud,— then you will render a verdict of guilty."

The defendant excepted " to that part of the charge which relates to the organization of the corporation,— as to whether it is a legal corporation "; also to that part of the " charge in regard to the defendant's duty as treasurer of the corporation, on the ground that there was no corporation and consequently he had no duty "; also " to that part of the charge in regard to whether or not the entry is false, was fraudulent, on the ground that if certificate No. 108 was an over-issue he could not be guilty of any fraudulent intent as against the Union Publishing Company, — that is, that the means he had to accomplish the fraud were not adequate to bring about the result."

After the charge had been given, the defendant requested the court to charge the jury as follows: " If you find that certificate No. 108 was an over-issue,— that is, that it represented stock in excess of the amount which the corporation was authorized to issue and that the respondent knew it was an over-issue,— then it was an invalid and illegal certificate, its issuance was no fraud on the corporation, and the record of it on the stub, however false, was not made with the intent to defraud the corporation. There could be no intent, in a legal sense, to defraud the corporation unless the means employed by the defendant had some tendency to produce that result; but the record of an invalid and illegal certificate would have no tendency to produce that result." This request was denied, and the defendant excepted.

*James P. Tuttle,* solicitor, *Edwin G. Eastman,* attorney-general, and *Robert J. Peaslee,* for the state. The exceptions in this case may be divided into four distinct parts: (1) To the order for an adjournment to Nashua; (2) to the order for issuing *venires* for jurors; (3) to the evidence; (4) to the charge.

I. Upon the respondent's motion for a change of venue, the court ordered that the trial be had at Nashua. To this order the respondent excepted, but did not state his grounds for exception until the adjournment had taken place and a jury had been impaneled. By asking for a change of venue the respondent waived his right to be tried at Manchester. "A person ought not to be heard to complain of that to which he has consented." *State* v. *Albee*, 61 N. H. 423, 428.

After a week spent in taking testimony upon his motion for a change of venue, the respondent excepted to an order that he be tried at a place removed from the scene of his alleged misdoings. It will be said he asked for a trial in another county, and that the order was for a trial at another place in the same county. But the distinction is purely a technical one. He asked for a removal from the scene of his troubles. A removal was granted, not so great as he wished, to be sure, but can he for this reason be heard to say that he objects to a change in the place of trial? A respondent will not be permitted to try experiments with this motion, and later withdraw it if the manner in which it was granted does not suit him. *State* v. *Hayes*, 88 Mo. 344, 346, 347; *State* v. *M'Lendon*, 1 Stew. (Ala.) 195, 196, 197. Good faith, fair dealing, and the well-established rules of the law of waiver require that this exception should be overruled.

But aside from the question of waiver the exception has no merit. Section 3, chapter 207 of the Public Statutes provides that the court may adjourn the term as a whole, and that in certain contingencies that adjournment may be to another place in the county. Chapter 56, Laws 1895, provides for temporary and partial adjournments to some other place in the county. It will be argued that the act of 1895, being in the form of an amendment to P. S., *c.* 207, *s.* 3, the provisions of section 4 of that chapter apply to this amendment, and that no adjournment under its provisions can be made except upon publication of notice. Such construction would nullify the act of 1895. To anticipate by four weeks the exact time when some case would be reached which should be tried at some other place than that where the court is sitting would be impracticable. It might be that the whole term would not take that length of time, and such is frequently the case. Nor does the same reason exist for the publication of notice in such event as where the whole term is adjourned. In the latter case all who, according to the ancient theory, seek relief from the court must attend at some new place, and it is manifestly proper that public notice should be given. But where the adjournment is for specified cases, only a few parties, who are already in court, are interested, and as to them the publication of notice must be an idle ceremony. What notice would a publication of this adjournment have given? It would

only have added to the publicity of which the respondent was complaining. If the citizens of the county read it, the respondent would claim that they were disqualified to act as jurors, for one trial of this respondent was broken off because jurors had read newspapers. But the public had no right to read it. It was none of their business. The only parties interested were the state and the respondent. Both parties were already in court; and being thus in court, one of them says that an order of that court cannot take effect upon him until he is notified thereof by a publication in some newspaper for three successive weeks. The lack of such notification is what he complains of and all he complains of; and so choice was he of this rare complaint that he kept it carefully concealed until after the adjournment and the impaneling of a jury at Nashua.

From time to time many intricate rules have been laid down by courts for the construction of statutes, but they are little regarded in this state. " The legal construction of the act is the ascertainment of the intention of the legislature." *State* v. *Hayes*, 61 N. H. 264, 330; *Barker* v. *Warren*, 46 N. H. 124. What the intention of the legislature was in this instance is not open to question. They intended to provide for just what was done in the case now before the court. They in terms provide for an adjournment for one or more days, as may be necessary for trials. They contemplated adjournments for brief and necessarily uncertain periods, to be had when the occasion therefor should arise. To hold that there must be three weeks' notice of such adjournment is to nullify the act. Nor does the construction we are contending for do violence to the language of the statute taken as a whole. By the act of 1895 a new power was given to the court. It was not the mere addition of a new cause for which the existing power might be exercised. Public Statutes, *c.* 207, *s.* 3, gives power to adjourn a term *in toto*. The act of 1895 gives power to adjourn for certain specified purposes, leaving the remainder of the business of the term to be transacted thereafter and at the place where the term is held. The legislature recognized this distinction by separating the grant of the new power from the old by a full stop. The ordinary power to adjourn from time to time and the power to adjourn the term to some other place are made parts of a compound sentence. This is manifestly proper, for the two are only different forms of exercising one power — that to adjourn the term. It is equally proper that the new power should be given without words or punctuation connecting it with the old. Such was the course pursued by the legislature. The grant is distinct and separate. It does not refer to what goes before it, it is in itself complete, and is sufficient for the purpose intended.

There are, then, two distinct kinds of adjournments to another

place,— one of the whole term, the other of some specified cases. To what does the phrase in section 4, "such adjournment to another place," refer? The word "such" indicates some particular kind, quality, or character before specified. The word "adjournment," being in the singular number, refers to only one kind or character of such adjournment to another place before specified. If the legislature had intended that the provisions of section 4 should apply to both kinds of adjournments to another place, that section should have been amended as well as section 3. This provision of section 4 does not necessarily apply to the adjournment last mentioned. P. S., c. 2, s. 1; 2 Kent *555; 1 Bish. Cr. Proc. (3d ed.), s. 512. It will hardly be contended that the legislature intended that the provisions of section 4 should apply to adjournments for a few days and not to those of the whole term. It should apply to those adjournments in which the public have an interest. It should apply to but one kind of adjournments to another place. It should not apply to those the legislature did not intend to have it apply to, especially when such application would serve no useful purpose and only tend to defeat the whole effect of the act.

Upon this question we claim : (1) That the motion for a change of venue was such a waiver of the respondent's right to be tried at Manchester that he cannot be heard to complain of an order for a trial at Nashua; (2) that the provisions of section 4 of chapter 207 of the Public Statutes do not apply to the adjournments provided for by chapter 56, Laws 1895, and that no notice of an adjournment under that act is necessary.

II. The court, by excluding jurors from Manchester and adjacent towns, did not deprive the respondent of a trial by jury, according to the course of the common law prior to the adoption of our constitution in 1784. The respondent contends that he was not tried by a legal jury because, (1) the jurors summoned to try the case did not come from the vicinage, as that term was understood prior to the adoption of our constitution,— in other words, because the court in sending out the *venires* excluded Manchester, the place where the alleged offence was committed, and certain adjacent towns; (2) if he was not, under the constitution, entitled to a jury of the vicinage, the jurors should at all events have been drawn from the body of the county, and by excluding Manchester and the adjacent towns the jury did not come from the body of the county.

The practice of drawing jurors in criminal cases from the vicinage had become obsolete in England and this country prior to the adoption of our constitution in 1784; and all the reasons upon which the right at common law were based had ceased to exist long before that date. In England, in the time of Edward I, jurors were considered as witnesses. " They were sworn to

speak the truth, to discharge which duty they must speak from their own knowledge and not from the testimony of others; and as they came from the vicinage where the fact was committed, none, it was thought, could be better able to perform the office than themselves." It was many years after this reign, when the petit jury began to be considered rather as judges of the presumption raised by the finding of the presentors than as witnesses of the fact, that a kind of evidence used to be exhibited to them. 2 Reeve Eng. Law 572; 1 Bish. Cr. Proc. (3d ed.), *s.* 363. "During the earliest ages of our judicial history, jurors were selected for the very reasons which would now argue their unfitness, *videlicet,* their personal acquaintance with the parties and the merits of the cause; and few rules of law were enforced with greater strictness than those which required that the *venue, visne,* or *vicinetum,* in other words the neighborhood whence the jurors were to be summoned, should be also that in which the cause of action had arisen, in order that the jury, who were to determine it principally from their own private knowledge, . . . might be persons likely to be acquainted with the nature of the transaction they were called upon to try. . . . Anciently, the jury, in order that they might be persons well acquainted with the controversy, were summoned out of the very hundred designated for the venue." This rule was relaxed by statute so that at one time six hundredors only were required. That number was afterwards reduced to four, and subsequently to two, until finally the requirement was abolished by 4 and 5 Anne, *c.* 6 (A. D. 1706–7), except as to actions founded upon penal statutes, to which the abolition was extended by 24 Geo. 2, *c.* 18 (A. D. 1751); so that in 1751, in civil cases it was sufficient if the jury be summoned from the body of the county in which the venue was laid by the declaration. 2 Sm. L. C. (9th Am. ed.) 939, 940; *State* v. *Sawtelle,* 66 N. H. 488, 505.

The causes leading to the abolishment of this law were, that after a time jurors ceased to be witnesses. Then so long as the jurors must come from the neighborhood or *vill* where the cause of action was laid, some of the jury must be returned from the hundred in which such *vill* lay, and if none were returned the array might be challenged for a defect of hundredors. This caused much vexatious delay in the trial of causes, and many devices were resorted to for avoiding the law. Sir Edward Coke gave such a variety of circumstances whereby the court permitted the number to be evaded, that it appears that they were heartily tired of it. 3 Bl. Com. 365. Then the supposed advantage of having jurors who knew beforehand the character of the parties and witnesses, and for this reason knew what credit to give to the facts alleged in evidence, was found in practice to be overbalanced by the "very natural and almost unavoidable

inconvenience, that jurors coming out of the immediate neigh-
borhood would be apt to intermix their prejudices and partiali-
ties in the trial of right." 3 Bl. Com. 359, 360. So the practice
was gradually relinquished before it was finally abolished by
statute of 24 Geo. 2. And the same was true in criminal cases,
although the right was not actually abrogated by statute in
England until 6 Geo. 4 (A. D. 1825). In practice it was wholly
disregarded for the same reasons that made it a dead letter in
civil cases.

Long before 1784 the jury ceased to be witnesses, and the
inconvenience arising from the right to challenge for want of
hundredors, and the perversion of justice following too much
knowledge by jurors of the parties and the facts, had placed this
law in such disrepute that it was wholly disregarded in practice.
All the reasons upon which it was based had then ceased to
exist. It is true that the existence of the law was recognized in
Hawkins' Pleas of the Crown, published as late as 1787; but in
a work written at an earlier date, although not published until
later, it is said that the jury "are to be *de vicineto*, but this is
not necessarily required; for they of one side of the county are
by law *de vicineto* to try an offence of the other side of the
county." 2 Hale P. C. 264. In 3 Thomas' Coke 465, note 8, the
writer, after reviewing the great disadvantages arising from re-
quiring jurors to be summoned *de vicineto*, and to the acts abol-
ishing the right in civil cases, says: "Why a regulation so
convenient should be thus confined principally to civil cases
seems unaccountable. However, though the ancient law contin-
ues in force as to trials for crimes, yet it hath long been devi-
ated from in practice; Lord Hale taking notice that even dur-
ing his time he never knew an instance of a challenge for
want of hundredors in treason or felony; and the sheriff, as
we are well informed, now always summoning juries from the
county at large, without the least regard to the *visne* of each
indictment."

"It seems that until recently the right to challenge for want
of hundredors existed, . . . and although the practice had fallen
into disuse, the right was not actually abrogated until the act of
6 Geo. 4, *c.* 50." 1 Ch. Cr. L. 177. "So completely are we
divorced from the common-law view as to the necessity of a
jury of the *visne*, that it is regarded as erroneous for the
court to direct the sheriff to summon jurors, upon a special
*venire*, in a capital case, 'residing as near as may be to the place
where the murder was committed.'" Thomp. & M. Jur. 3.

The practice of summoning jurors from the vicinage became
obsolete and at length was abolished by statute in all cases.
Prof. Jur., *s.* 80. "In none of our states, it is believed, are
jurors summoned *de vicineto ;* but in all they come *de corpore*

*comitatus* — from the body of the county, not from the immediate neighborhood in which the offence was committed. Hence in reason, the question stands with us as it was put in England by the statutes of 6 Geo. 4." 1 Bish. Cr. Proc. (3d ed.), *s.* 370. It is certain that in criminal cases the custom of requiring jurors from the vicinage had ceased in England before 1784, and, as before stated, upon the ground that the reasons upon which the law was based had ceased to exist. "Reason is the soul of the law, and when the reason of any particular law ceases, so does the law itself." Broom Leg. Max. 160. "At the present day it is thought a greater object, and more likely to secure the due administration of justice, to submit causes to impartial and unbiased jurors; and that those are less likely to be so who have come from the immediate neighborhood of the parties, and have been either eye-witnesses to the facts or have had their minds imbued with the popular feeling as to the merits of the controversy." *Schmidt* v. *Insurance Co.,* 1 Gray 529, 535.

The trial by jury secured to the subject, according to the course of the common law, within the meaning of our constitution, must and does mean the unwritten jury law brought to this country by the first settlers, in so far as it had not been altered by usage or legislation before 1784. *State* v. *Saunders,* 66 N. H. 39, 75; *Pet'n of Mt. Washington Road Co.,* 35 N. H. 134, 142–145; *Cocheco Co.* v. *Strafford,* 51 N. H. 455, 457–459. Whatever the usage might have been in England at one time, it is, in the light of authorities hereinbefore cited and quoted, clear that the summoning of jurors *de vicineto* ceased long before the adoption of our constitution. The authorities before cited, and others so far as we have been able to examine, show that this usage has never obtained in this country, but that jurors are summoned from the body of the county. "Neighborhood" includes the county. *Commonwealth* v. *Dorsey,* 103 Mass. 412, 418; *Convers* v. *Railroad,* 18 Mich. 459, 468.

The records of the courts in this state show that this usage did not exist here prior to 1784. The state was divided into counties in 1771. 7 Prov. Papers 276; *State* v. *Albee,* 61 N. H. 423, 428. Before that time, courts were holden at Portsmouth and Exeter. The court records for Rockingham county are the records of the entire state down to 1771. An examination of the *venires* from 1754 to 1770 shows that the same jurors were summoned for the trial of both civil and criminal causes, and for a greater part of the time all the jurors were taken from the immediate vicinity of Portsmouth and Exeter. For example, at the September term, 1762, for the court of general sessions of peace and the court of common pleas, the *venires* required the several towns to return the same jurors to serve at both courts. The jurors for that term were drawn from Nottingham 1, Ports-

mouth 3, Greenland 1, Exeter 2, Newmarket 1, Stratham 1, Hampton 1, Dover 2, Hampton Falls 1, North Hampton 1, Durham 1, Rye 1. At this time there were one hundred and thirty towns in the province. It was found that many of the jurors returned by the sheriff or coroner to serve at the several courts did not attend, and by reason of challenges of those attending, a sufficient number of jurors could not be obtained to transact the business before the courts. For this reason the general assembly in 1754 passed an act authorizing the justices of the superior court of judicature, the court of common pleas, and general sessions of peace, when in session, to cause a writ of *venire facias* to be forthwith issued to the sheriff, requiring the appointment and return of so many good and " lawful " men to serve as petit jurors as said courts respectively should order in such writ.

At the August term, 1766, of the superior court of judicature, a special jury was drawn by order of court, and this entry, made on the first Tuesday of the term, appears on the clerk's docket: "The court ordered *venires* to issue for eighteen jurors, to attend on Tuesday, the 23d inst., from such places as may be thought convenient." The records show that both the jury for the term and this special jury were summoned from the same towns, and these jurors tried both civil and criminal cases. The records of the courts show that from 1754 to 1771 the same jurors tried both civil and criminal causes, and, although cases were tried, both civil and criminal, where the parties resided in Concord, Gilmanton, Lebanon, Hanover, and Plymouth, and almost every town in the province, we do not find an instance, before 1771, where a juryman was drawn from a town north of Concord, and only one or two instances where jurymen came from west of the Merrimack river. In almost every case the jury were taken from those towns now constituting the eastern half of Rockingham county, and from Barrington, Rochester, Somersworth, Durham, and Dover in Strafford county. They were taken, as the docket entry shows, from such places " as might be convenient "; and in practice this method of selecting jurors has continued down to the present time without any substantial change, except that in 1827 the amendment was made providing that jurors should be summoned so that each town might furnish its proportion of jurors in each year. The purpose of this act, manifestly, was to equalize the burden of performing jury service, towns " conveniently " near the place of holding the court having been called upon to perform more than their share of this duty. The statute of 1827 is directory. Its only purpose is the one above indicated. It was not intended that the court should sit down and figure out the exact proportion of men to be taken from each town.

The law of 1785 provides for the appointment and choice of

petit jurors, the choice to be made by the court, from men selected by the town clerk and selectmen in town meeting, instead of by the sheriff; and the records show that this had been the practice since 1758. But this act does not require jurors to be taken from every town in the county. The language of the statute is, " The *venire facias* for said jurors shall be issued by the clerks of the respective courts aforesaid, . . . and shall be directed to the clerk of the town or parish"; not to the respective clerks of all the towns and parishes. The law of 1813 changes the method of selecting grand and petit jurors, but it contains no direction as to where jurors shall be taken from. That the practice of summoning jurors from the hundredors never obtained here, either before or since 1784, is clearly and unequivocally established by the records. The great object to be attained is to secure a fair and impartial trial for persons accused of crime. That this former incident of a trial by jury tends in any degree to produce such a result nobody, today, can seriously argue. It was not considered of the substance of the jury trial right before 1784; and it is, therefore, no part of trial by jury, as that expression is to be interpreted in our constitution. *State* v. *Saunders, supra ; Opinion of the Justices,* 44 N. H. 633.

In the case at bar, the respondent's attempt to set up this ancient custom is absurd. In his written motion for change of *venue* he says that conclusive evidence has been submitted to the court showing that the general prejudice of the citizens of Manchester and Nashua is so bitterly and intensely hostile against him, that there is good reason to believe that he cannot have a fair and impartial trial in either of said cities. But now he says, because the court excluded jurors from those places, that he has not had a legal trial, although it may have been an impartial one. We think the court will be slow to recognize the validity of a law, either ancient or modern, which leads to such results.

The respondent claims that, if he was not entitled to a jury of the vicinage, at all events the jurors must be drawn from the body of the county; and that the jurors from Manchester and adjacent towns having been excluded by the court, the array from which the jury was impaneled in his case was not from the body of the county. " The court shall direct the number of jurors to be summoned, and from what towns, so that each may furnish its proportion of jurors in each year." P. S., *c.* 209, *s.* 7. Under the authority of this statute the *venires* were issued in this case ; and if the respondent's position is correct, either this law is unconstitutional, or the court abused its discretion.

The statute is constitutional. It provides the means and the methods by which the right to trial by jury is enjoyed. The constitution merely guarantees the right, and leaves the legislature the duty of providing the means and methods by which it is

to be enjoyed. The time and place of trial, the qualifications of jurors, and the manner in which twelve should be selected for the trial of the case, including all steps from the *venire* to the challenge, are to be determined by the legislature, subject to the limitation that the substance of the jury trial of 1784 is preserved. *State* v. *Wilson*, 48 N. H. 398; *Copp* v. *Henniker*, 55 N. H. 179, 198; *State* v. *Griffin*, 66 N. H. 326, 327; *Commonwealth* v. *Dorsey*, 103 Mass. 412, 418, 419; *Foster* v. *Morse*, 132 Mass. 354; *In re Marron*, 60 Vt. 199; *Walter* v. *People*, 32 N. Y. 147, 159; *Stokes* v. *People*, 53 N. Y. 164; *Perry* v. *State*, 9 Wis. 19; *Rafe* v. *State*, 20 Ga. 60. It cannot reasonably be contended that this method of selecting a jury impairs the right in any way. It puts the power of selection in the hands of the court, whereas formerly it was left substantially with the sheriff. Many changes have been made by legislative acts in respect to the qualification of jurors, the methods of selecting and summoning them, and of forming the panel, which differ materially from the ancient practice, yet they have not been construed as violations of the constitution.

The exclusion of jurors from Manchester and adjacent towns was not an abuse of discretion on the part of the court. The respondent contends that the jurors were not drawn from the body of the county. Accepting his definition, that the "body of the county" means the county at large, as distinguished from any particular place in it, how does the case in fact stand? Body of the county, we submit, means something more than a majority of the population. It must have some reference to the area of the inhabited territory within the county. An inspection of the map of Hillsborough county shows that the inhabited area from which the jury was drawn is about five times as large as that from which they were excluded. It is as large as any county in the state except Grafton or Coös. Manchester and Nashua, according to the last census, had a population of 67,000, and Hillsborough county had 93,000. All the county, outside of these two cities, contained 26,000 inhabitants, of whom 22,000 were in the towns drawn from. In important criminal cases, as will hereafter appear, the custom has been to exclude jurors from the town in which the offence was committed and from adjacent towns. The jury were not drawn from a particular part of the county. Out of a population of 26,000 from which the jury could properly be taken, they were summoned from 22,000. Of the territory and eligible inhabitants more than fifty per cent was represented; and this, we submit, constitutes the body of the county. The constitution does not require that the jury shall be summoned from every town in the county, nor is such a requisite essential to secure a fair and impartial jury.

The respondent complained on his motion for a change of venue, that he could not have a fair and impartial trial in Hills-

borough county, for the reason that the inhabitants in the excluded towns were hostile to him. If a majority of the population constitutes the body of the county, as the respondent contends, then the court ought to have summoned three fourths of the jurors who were to try him from this hostile country (which embraced, as he says, 75,000 people), or else he should have been allowed to go to some other county for trial. The court found that he could have a fair trial in Hillsborough county, and that reputable witnesses testified that such trial could be had in Manchester, by a jury made up, in part, from its citizens. Suppose the court had applied the respondent's law to this state of facts, and had taken three fourths of the jury from the territory excluded. When the jury came to be impaneled, the respondent would have objected that three fourths of them came from towns hostile to him. The court then might have excused the jurors so drawn, or might have properly said, according to the respondent's contention : " I have found that you can have a fair trial in this county, and I am bound by law not only to take jurors from all the towns, but also to take them proportionally; you must be tried by a legal jury." The respondent would have excepted, and rightly. He would then claim that he was not tried by an impartial jury. He does not now claim that the jury was prejudiced, or that an impartial jury could not be selected from Hillsborough county; but his grievance really is, that he was not tried by jurors taken from towns that he alleged were hostile to him. Is the court to hold that because there may be a few towns in a large county where the respondent imagines jurors would be hostile to him, either (1) there must be a change of venue, or (2) that the jury must be drawn from all the towns, and then excused from the towns complained of, or (3) the risk must be run by the state of having the verdict set aside, because jurors came from hostile towns ?

According to usage and practice in this state, both before and since the adoption of the constitution, the jurors were properly drawn. As we have already stated, the records of the courts in the province show that the jurors were taken from a very small number of towns, and the same was true until the act of 1827 was passed. The records of Rockingham county show that since that act it has not been the custom to draw jurors from more than two thirds of the towns in the county for any term of court. We call attention to a few cases where jurors have been drawn to try criminal cases, as showing what the practice has been and is in this respect.

At the August term, 1768, of the superior court of judicature, Ruth Blay was tried for concealing the death of a bastard child. No special jury was drawn, but the jurors for the term came from twenty-eight towns out of 125 in the province. At the

same term one Matthews, of Merrimack, was tried for passing counterfeit money. No jurors were drawn from that town. This jury tried both civil and criminal cases.

At the Novenber term, 1774, general sessions of peace, sixteen jurors were drawn from twelve towns,— Portsmouth, Exeter, Newington, Rye, Greenland, East Kingston, Epping, Sandown, Deerfield, Hampton Falls, Northwood, and Poplin.

At the September term, 1820, of the superior court of judicature for Rockingham county, Joshua Wiggin was tried at Portsmouth for murder, committed in Stratham. No jurors were drawn from Stratham, North Hampton, Hampton, Newmarket, Greenland, Newington, Portsmouth, Newcastle, or Rye.

At the October term, 1868, of the supreme judicial court for Rockingham county, Josiah Pike was tried at Portsmouth for murder committed in Hampton Falls. The jurors were taken from fifteen towns, out of forty towns and wards in the county. None were drawn from Hampton Falls.

At the January term, 1873, of the supreme judicial court for Rockingham county, Franklin B. Evans was tried for murder committed in Northwood. Eighty special jurors were drawn from nineteen towns and wards, out of forty in the county. No jurors were drawn from Northwood or any adjoining towns.

At the October term, 1888, of the supreme court for Rockingham county, James Palmer was tried for murder committed in Portsmouth. Thirty-five special jurors were summoned from sixteen towns, having a population, according to the census of 1890, of 21,496. The county then had 49,590 population, the towns drawn from representing three sevenths of the population of the county. No jurors were drawn from Portsmouth, Newington, Newcastle, Stratham, Rye, North Hampton, or any towns in the southeastern part of the county.

At the April term, 1891, of the supreme court for Rockingham county, Murphy and others were tried for the murder of one Reed, at Salem. One hundred special jurors were summoned from eighteen towns and wards in the county. No jurors were summoned from Salem and adjoining towns.

Section 11 of the act of 1827 provides, "that the number of jurors to be summoned at each term, and the towns to which *venires* shall be directed for that purpose, shall be regulated by said courts respectively, *provided* that each town in the respective counties shall be required in the course of each year to furnish its due proportion of jurors." Laws, *ed.* 1830, *p.* 468. This statute is merely directory, and was designed to relieve towns conveniently near the place of holding the courts from being obliged to perform more than ·their share of jury service. The act is declaratory of what had long been the usage and practice in selecting jurors, except the provision requiring towns to furnish their due proportion of jurors.

In conclusion upon this branch of the case, we submit (1) that the practice of taking jurors from the vicinage had become obsolete in England for more than a century prior to the adoption of our constitution, all the reasons upon which it was based having ceased to exist, and that no such law or practice ever obtained here; (2) that section 7 of chapter 209 of the Public Statutes is constitutional, being merely declaratory of the usage and practice of summoning jurors existing before and since 1784, and that the court in drawing the jury acted in accordance with the constitution, the law, and custom pertaining thereto.

III. The evidence that there was an over-issue of stock was competent to show the respondent's motive for making a false record. *State* v. *Dearborn*, 59 N. H. 348; *State* v. *Lapage*, 57 N. H. 245, 294. The evidence that the amount of stock to be issued was limited to 1,500 shares stands on the same ground. Whether the increase was legal or not, there was no authority to issue more than it provided for.

The record showed that the by-laws were adopted before the articles of agreement were recorded, but that they were subsequently recognized and acted upon by the corporation. This was competent evidence of their adoption by way of ratification. 1 Mor. Corp., s. 498; *Union Bank* v. *Ridgeley*, 1 H. & G. 324, 413, 415.

Fellows testified that he was elected and acted as clerk, and it appeared that he was sworn. He was at least a *de facto* officer, and as such his acts were valid. *Hughes* v. *Parker*, 20 N. H. 58, 72; *Insurance Co.* v. *Moore*, 55 N. H. 48, 54. If he was legally acting as clerk, the record was competent under the usual rule as to corporation records. If he was not legally acting and there was no regular record, the evidence was competent as being the best to be had of what action was taken by the corporation as to the matters concerning which he testified. *Insurance Co.* v. *Moore, supra*, 55.

The evidence of the election of the respondent as treasurer in 1885 tended to show the extent of his knowledge of the affairs of the corporation. It makes no difference whether the election was legal or not. He acted as treasurer and assumed all the liabilities incident to the office. *Rex* v. *Borrett*, 6 C. & P. 124; *Neale* v. *Overseers*, 5 Watts 538; *State* v. *Maberry*, 3 Strob. 144.

IV. The jury were instructed that if the articles of agreement, the records, and the special act of 1885 were what it was claimed they were, they would find that this was a corporation. The articles of agreement are sufficient in form, are properly signed, and were recorded in November, 1880. By force of the statute as it then stood this was all that was necessary to make this a corporation. G. L., c. 152, s. 1. But whether this was

sufficient or not, the fact that the state has since recognized it as a corporation (Laws 1885, *c.* 151) has cured any defect. *Railroad* v. *Kyle,* 64 N. Y. 185; *Kanawha Coal Co.* v. *Coal Co.,* 7 Blatchf. 391, 406; *Basshor* v. *Dressel,* 34 Md. 503, 511. The question of the existence of the corporation could not be inquired into in this collateral way. *State* v. *Carr,* 5 N. H. 367, 370, 371, cited and approved in *Haynes* v. *Brown,* 36 N. H. 545, 562.

The only other exception relates to the refusal to charge that the means used could not work a fraud on the corporation. It has long been held that it is no defence to an indictment for forgery that the writing was one which, if genuine, could not be enforced against the apparent maker. Thus, to falsely issue bills of a bank whose charter has expired may be forgery. *State* v. *Hayden,* 15 N. H. 355, 359. And the same may be true of municipal obligations which no one has the power to issue. *State* v. *Eades,* 68 Mo. 150. So here, the respondent is liable for the false record, even if the certificate might be invalid. The law was enacted to provide means whereby any one interested in the corporation might know how much stock had been issued. It provides that "the treasurer . . . shall keep . . . a true record . . . of every certificate issued by him." P. S., *c.* 149, *s.* 12.

On its face this piece of paper known as No. 108 was a certificate. It might be void, or it might be valid. It might be invalid as a certificate of stock and valid as a claim against the corporation for money had and received, or it might be the basis for an action for the deceit practiced by the corporation's agent. Whether it was one or the other depended upon extrinsic evidence, and the corporation was entitled to know just what the certificate purported to be. Like forgery, the crime here charged is an attempt to cheat by means of a false writing. In such cases it is held that "since men are not legally presumed to know facts, a false instrument which is good on its face may be legally capable of effecting a fraud, though inquiry into extrinsic facts should show it to be invalid even if it were genuine, therefore the forging of such an invalid instrument is a crime." 2 Bish. Cr. L., *s.* 541.

As the forger is not permitted to say of a document "fair on its face," that he is not guilty because the instrument if genuine would be invalid, so this respondent should not be heard to say that he is not guilty because the apparently valid certificate of which he made a false record was in itself a cheat and a fraud. The proposition advanced in behalf of the respondent is that the commission of one crime shall constitute a defence to a prosecution for the commission of another crime. Such a proposition should, and we believe will, receive scant consideration by this court.

*Streeter, Walker & Hollis, Joseph W. Fellows, Charles H. Burns,* and *Stephen S. Jewett,* for the defendant.

BLODGETT, J.   At the argument but two exceptions were insisted upon in the defendant's behalf: *first,* to the order adjourning his trial to Nashua without proper notice; and, *second,* to the order issuing *venires* to jurors from certain towns only in the county.   Neither requires other than brief consideration.

Whether it might properly be held, under the circumstances detailed in the case, that the first exception is not open to the defendant, has not been considered because there is a broader and a more satisfactory ground upon which the exception must be overruled.

The adjournment was had by virtue of an amendment, so called, to *s.* 3, *c.* 207, P. S., contained in *c.* 56, Laws 1895, which provides that "When in the opinion of the court the public good will be promoted thereby, it may adjourn to another place in the county for one or more days, as may be necessary, for the arraignment and trial of prisoners or trial of civil causes." Prior to this amendment, the statutory power of the court to adjourn to another place in the county was limited to an adjournment of the term as a whole (P. S., *c.* 207, *s.* 3), and this could be done only by an order of notice published in some newspaper (*Ib., s.* 4) "three weeks successively, and the last publication one week, at least, before the day or thing of which notice is given."   P. S., *c.* 2, *s.* 32.

The lack of such notification is the defendant's sole ground of complaint.   It is not denied that he had actual and seasonable notice of the adjournment, and no claim is made that he was in any way prejudiced or injured because the provisions of *s.* 4 as to publication were not complied with.   At most, therefore, the objection is a technical one purely.   But, even as such, it has no merit, for we are clearly of opinion, upon the reasons given and the authorities cited by the state's counsel, that no newspaper publication of an adjournment under the amendment of 1895 is necessary, as against parties having actual and seasonable notice.   It would not only be a useless ceremony, which the law of this jurisdiction never requires, but it would practically be subversive of the undoubted objects sought to be attained by the legislature in the enactment of the amendment, which were to facilitate the business of the term, to subserve the interests of parties, to secure fairness of trial when imperiled by local prejudice or other cause, and to promote the public good.   It is unnecessary to go farther, but it may properly be added that even if the term itself had been adjourned to Nashua without such publication, it is not perceived on what ground the defendant would be entitled to complain.   The only object of *s.* 4 mani-

festly is to give reasonable notice of the change of place to all persons having business in court. This the defendant had, and no damage to him having resulted through the omission of publication, we are not aware of any legal principle which would enable him to object that other parties and the public generally were not notified.

The second exception rests entirely upon the alleged unconstitutionality of *s.* 7, *c.* 209, P. S., which enacts that "The court shall direct the number of jurors to be summoned, and from what towns," etc.

While other satisfactory answers to this contention are not wanting, it is only necessary to say that, practically and in effect, such has been the law since 1758. Prov. Laws, *ed.* **1771,** *pp.* 189, 190, *s.* 2; Act of June 17, 1785 (Laws, *ed.* 1789, *pp.* 43, 44; *ed.* 1805, *p.* 107; *ed.* 1815, *p.* 122); Act of July 4, 1827, *s.* 11 (Laws, *ed.* 1830, *p.* 468, *s.* 11); R. S., *c.* 176, *s.* 5; C. S., *c.* 186, *s.* 6; G. S., *c.* 194, *s.* 6; G. L., *c.* 213, *s.* 6. In view of this fact, there remains no room for doubt or disputation that when our constitution was adopted the right of trial in use here was the right to be tried by impartial jurors drawn from such towns in the county as the court directed; and if this be so, the defendant has no valid ground of complaint upon this branch of the case. *East Kings'on* v. *Towle*, 48 N. H. 57, 64; *Copp* v. *Henniker*, 55 N. H. 179, 193; *State* v. *Almy*, 67 N. H. 274.

Nor has he upon any branch of it. In any aspect consistent with legal principles, neither his exception to the denial of his request for additional instructions to the jury, nor any of his other exceptions (all of which have been sufficiently answered in the brief for the state), can avail him. He has had his full day in court; he has been heard at length by his counsel and by his witnesses, and might have been heard by himself; he has been tried by a jury " as impartial as the lot of humanity will admit," drawn from the body of the county (*State* v. *Sawtelle*, 66 N. H. 488, 505–507), in accordance with the law as well as with the uniform and heretofore unchallenged practice of nearly one hundred and fifty years; he has been given the benefit of quite sufficiently favorable instructions for their guidance and his protection; he has been denied none of the safeguards, either constitutional or statutory, which attach to persons in his situation; and we are constrained to hold that, in all respects, his conviction has been " conformably to the laws."

*Exceptions overruled.*

PIKE, J., did not sit: the others concurred.